UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AUSTIN ISAAC HAMILTON,
    Petitioner,

v.                                                   Case No. 8:21-cv-1390-KKM-CPT

SECRETARY, DEPARTMENT
OF CORRECTIONS,
    Respondent.
_____

## ORDER

Hamilton, a Florida prisoner, timely[1] filed a pro se Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 challenging his state court judgment based on the alleged insufficiency of the State's evidence. (Doc. 1.) Such a claim is frivolous upon any review of the record. Hamilton, the sole caregiver of a one-year old on the day of death, was convicted of first-degree murder and aggravated child abuse. The child suffered severe blunt force trauma, lacerations of his liver, and significant bruising and swelling to his groin. Hamilton

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See* § 2244(d)(2). The state appellate court affirmed Hamilton's convictions and sentences on February 7, 2020. (Doc. 6-2, Ex. 6.) His judgment became final 90 days later, on May 7, 2020, when the time to petition the Supreme Court of the United States for a writ of certiorari expired. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). After 327 days of untolled time elapsed, on March 31, 2021, Hamilton filed a petition alleging ineffective assistance of appellate counsel. (Doc. 6-2, Ex. 11.) That petition remained pending until the state appellate court denied it on May 6, 2021. (Doc. 6-2, Ex. 12.) Hamilton filed his § 2254 petition on June 2, 2021, after another 26 days of untolled time. (Doc. 1, p. 1.) As a total of 353 days of untolled time elapsed, Hamilton's petition is timely.

1

admitted that he struck the baby with a belt *ten* times after losing his temper. In addition to Hamilton's own admissions, much medical testimony confirmed the cause of death. Of course, I need not consider whether this overwhelming evidence satisfies the federal sufficiency of evidence standard under the Due Process Clause because Hamilton procedurally defaulted the claim in state court and thus is not properly reviewed in a federal habeas petition. And Hamilton fails to overcome the procedural default through showing cause and prejudice. Thus, the petition is denied. Because reasonable jurists would not disagree, a certificate of appealability also is not warranted.

I. BACKGROUND

A state court jury convicted Hamilton of first-degree felony murder and aggravated child abuse. (Doc. 6-2, Ex. 4.) The state trial court sentenced him to life in prison. (Doc. 6-2, Ex. 5.) The state appellate court per curiam affirmed his convictions and sentences. (Doc. 6-2, Ex. 6.) The state appellate court also denied Hamilton's petition alleging ineffective assistance of appellate counsel. (Doc. 6-2, Exs. 11 & 12.)

II. STANDARD OF REVIEW UNDER SECTION 2254

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of

the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In addition to satisfying the deferential standard of federal court review of a state court adjudication, a federal habeas petitioner must exhaust his claims by raising them in state court before presenting them in a federal petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A petitioner satisfies this exhaustion requirement if he fairly presents the claim in each appropriate state court and alerts that court to the federal nature of the claim. *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A petitioner shows cause for a procedural default when he demonstrates "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.*

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Hamilton argues that the procedural default of the federal claim presented in his petition may be excused because appellate counsel was ineffective under the Sixth Amendment for not raising the claim. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687. "Claims of ineffective assistance of appellate counsel are governed by the same

standards applied to trial counsel under *Strickland* . . . ." *Tuomi v. Sec'y, Fla. Dep't of Corr.*, 980 F.3d 787, 795 (11th Cir. 2020).

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Appellate counsel's performance "will be deemed

prejudicial if . . . the neglected claim would have a reasonable probability of success on appeal." *Tuomi*, 980 F.3d at 795 (internal quotation marks and citation omitted).

"The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.' " *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV.  ANALYSIS

Hamilton asserts that the State's evidence was insufficient to sustain his convictions. He alleges a violation of his federal constitutional right to due process. Respondent correctly asserts that Hamilton's federal due process claim is procedurally defaulted. When Hamilton challenged the sufficiency of the evidence on direct appeal, he cited cases applying Florida's unique standard of review for circumstantial evidence cases. (Doc. 6-2, Ex. 7, pp. 45-49.) He never cited Supreme Court precedent or the Constitution, or otherwise informed the state court that he brought a federal due process challenge. (*Id.*)

Florida's standard that governed at the time was markedly different too, providing that "[w]here the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence." *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 460 (11th Cir. 2015) (quoting *Thorp v. State*, 777 So.2d 385, 389 (Fla. 2000)). Florida's standard for circumstantial evidence thus "differs greatly" from the federal standard of review. *Preston*, 785 F.3d at 460.[2] The federal standard, articulated in *Jackson v. Virginia*, asks whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 443 U.S. 307, 319 (1979). Therefore, Hamilton did not fairly present a federal due process claim to the state appellate court. *See Preston*, 785 F.3d at 462 (stating that the petitioner did not bring a federal claim in state court when he relied on a unique rule of state law, cited exclusively to state law cases, raised argument about Florida law, and presented no other information in his brief that would have alerted the state court to a federal due process claim).

Hamilton cannot return to state court to present the federal claim in a second direct appeal. *See* Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within

---

[2] Florida has eliminated its distinct standard of review in circumstantial evidence cases, *Bush v. State*, 295 So.3d 179 (Fla. 2020), but the unique circumstantial evidence standard was in effect at the time of Hamilton's trial and direct appeal.

30 days of the rendition of sentence). Despite Hamilton's failure to raise the federal claim on direct appeal, the claim is technically exhausted. State-court remedies are exhausted "when they are no longer available, regardless of the reason for the unavailability." *Shinn v. Ramirez*, 596 U.S. 366, 378 (2022) (quoting *Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006)). But any federal due process claim is procedurally defaulted because it was "not presented to the state courts 'consistent with [the State's] own procedural rules'" requiring the claim to be brought on direct appeal. *Ramirez*, 596 U.S. at 378 (quoting *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000)). Hamilton does not show that the fundamental miscarriage of justice exception applies. *See id.*

Hamilton appears to assert in his reply that he meets the cause and prejudice exception. As cause, he asserts that his appellate counsel was ineffective for not raising the federal nature of the sufficiency of the evidence claim on direct appeal. "A showing of ineffective assistance of appellate counsel in failing to raise a claim on direct appeal can constitute 'cause' so long as the ineffective assistance 'occur[red] during a stage when a petitioner had a constitutional right to counsel,' . . . and the ineffective-assistance claim itself is 'both exhausted and not procedurally defaulted.'" *Sealey v. Warden, Ga. Diagnostic Prison*, 954 F.3d 1338, 1365 (11th Cir. 2020) (citing *Payne v. Allen*, 539 F.3d 1297, 1314 (11th Cir. 2008) and *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010)).

8

Hamilton argued in his petition alleging ineffective assistance of appellate counsel that his appellate counsel failed to "federalize" the sufficiency of the evidence claim and failed to cite *Jackson*. (Doc. 6-2, Ex. 11, pp. 6-6.2.) The state appellate court denied the petition without discussion. (Doc. 6-2, Ex. 12.) Thus, this Court assumes that the ineffective assistance of appellate counsel claim was properly exhausted in state court. *See Sealey*, 954 F.3d at 1365. And to "determine cause and prejudice," the Court must "ascertain whether [Hamilton] has shown ineffective appellate counsel" through the presentation of "underlying meritorious . . . claims." *Id.* at 1366 (quoting *Payne*, 539 F.3d at 1314).

Appellate counsel was not ineffective for failing to challenge the sufficiency of the evidence by raising a federal due process claim. As stated, the test under *Jackson* is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 443 U.S. at 319. The *Jackson* standard is "applied with explicit reference to the substantive elements of the criminal offense as defined by state law." 443 U.S. at 324 n.16.

Initially, a federal claim was not preserved for appeal. In presenting the motion for judgment of acquittal, through which Hamilton challenged the sufficiency of the evidence against him, he did not make a federal due process argument. (Doc. 6-2, Ex. 3, pp. 841-

9

44.) Hamilton does not show that appellate counsel was ineffective for failing to raise an unpreserved claim. *See Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1296 (11th Cir. 2017).

In addition, as explained above, Florida courts applied a distinct standard to circumstantial evidence cases—a standard that involved a "heightened burden of proof" requiring the evidence to be inconsistent with any reasonable hypothesis of innocence. *Preston* at 785 F.3d at 451; *see also Price v. Dixon*, No. 3:22-cv-5379-MCR-MJF, 2023 WL 3688458, at *5 (N.D. Fla. Mar. 10, 2023) ("[A]n argument based on Florida's circumstantial evidence rule involves a different, higher standard than the federal *Jackson* standard." (citing *Preston*, 785 F.3d at 451)). Therefore, invoking the Florida standard benefitted Hamilton by putting the State's evidence to a more stringent test.

Finally, even if counsel also could have presented the sufficiency of the evidence claim as involving a federal due process violation, Hamilton fails to establish that no rational trier of fact could have found him guilty when taking the evidence in the light most favorable to the prosecution. S.W., the one-year-old son of Hamilton's girlfriend, died after being in Hamilton's care on August 9, 2014. Hamilton babysat S.W. and S.W.'s seven-year-old brother that day while their mother ran errands and went to work. (Doc. 6-2, Ex. 3, pp. 365-68, 382.) S.W.'s mother left at around 10:00 a.m. (*Id.*, p. 369.) Hamilton and the two boys spent the day in the motel room where the children lived with their mother. (*Id.*, pp. 368-69.)

S.W.'s aunt (his mother's sister) came by at approximately 11:00-11:30 a.m. (*Id.*, p. 466.) She observed that S.W. seemed normal and that he was not crying or in pain. (*Id.*, p. 468.) Hamilton's friend Antonio Snead also visited that day. (*Id.*, p. 494.) S.W. was asleep, and when Snead was preparing to leave, he saw S.W. moving around as if he was ready to get up. (*Id.*, pp. 499-500.)

At about 7:30 p.m., Hamilton took the children to a Burger King. (*Id.*, p. 438.) Security video from Burger King showed that S.W. was in a stroller. (*Id.*, pp. 384-85.) The video's quality was poor, but several witnesses who watched the video stated that it did not appear that S.W. moved in the stroller or attempted to get out of the stroller. (*Id.*, pp. 385, 638-39.) S.W.'s mother stated that this behavior was unusual for S.W., who was typically "very active, hyperactive" in his stroller. (*Id.*, p. 385.)

At about 8:00 p.m., as S.W.'s mother was getting ready to leave work, Hamilton called her to say that S.W. was not breathing. (*Id.*, pp. 372-73.) She told him to hang up and call 911. (*Id.*, pp. 373-74.) She rushed home to find S.W. on the bed, not breathing and appearing blue and purple. (*Id.*, p. 375.) Both Hamilton and S.W.'s mother performed CPR on S.W. (*Id.*, pp. 376-77, 411.) Police arrived and took over CPR. (*Id.*, pp. 413-14.) S.W. was taken to the hospital, where he died.

At the hospital, S.W.'s mother observed scratches on his body, significant bruising on his right side from his ribs to his stomach, and swelling in his groin area. (*Id.*, p. 380.)

The injuries had not been present that morning. (*Id.*, p. 381.) When Officer Ruth Cate responded to the hospital, she similarly noted S.W.'s swollen scrotum, as well as linear bruising on his right side and back. (*Id.*, pp. 485-86.) Such bruising, in Officer Cate's experience, was consistent with being struck with a belt. (*Id.*) Detective Scott Bullard also saw marks on S.W.'s abdomen that were consistent with belt strikes. (*Id.*, p. 633.)

Dr. Laura Hair, the associate medical examiner who performed S.W.'s autopsy, testified about her examination and findings. (*Id.*, pp. 523, 527-28.) The seventh rib on S.W.'s right side, near the center of the abdomen, was broken. (*Id.*, pp. 530, 542-43.) S.W. had a scalp hematoma, and bruises on his forehead and chest. (*Id.*, pp. 530, 533, 540-42.) His scrotum was very swollen. (*Id.*, p. 534.) S.W. also had linear bruises on his back and the right side of his abdomen, near his liver. (*Id.*, pp. 533, 543-44.) Dr. Hair believed that the linear bruises were caused by blunt trauma and were consistent with his having been hit by a belt. (*Id.*, pp. 537-39.)

Dr. Hair found a bruise and six lacerations to S.W.'s liver, as well as a significant amount of blood in his abdomen. (*Id.*, pp. 540-41, 557.) The blood was from the lacerations to the liver; Dr. Hair explained that the liver is very vascular and bleeds profusely when cut. (*Id.*, p. 548.) She testified that the liver damage could have been due to S.W.'s being struck with a belt, but stated that the strikes would have to be "really hard." (*Id.*, pp. 544-45, 557.) Dr. Hair testified that being struck with a belt would not necessarily result

12

in breakage of the skin. (*Id.*, p. 557.) Dr. Hair also testified that it was possible the damage was caused by a fist, knee, or foot. (*Id.*, p. 545.) Dr. Hair stated that people may become sleepy and eventually pass out after experiencing the type of blood loss observed in S.W. (*Id.*, p. 547.) She would not expect a child to be active after sustaining such injuries. (*Id.*, pp. 547-48.)

Dr. Hair doubted that S.W.'s injuries would have been caused by falling or by his brother, describing the injuries as similar to those caused by a motor vehicle accident or a fall of at least two stories. (*Id.*, pp. 545-46.) She stated that the blood in the victim's scrotum could have trickled down from the abdomen, or there could have been blunt trauma to the testicular area. (*Id.*, pp. 549.) Dr. Hair stated that the bruise on S.W.'s head might have been three or more days old, but that his other injuries were acute and were consistent with having occurred on the day of his death. (*Id.*, pp. 552-53.) Further, Dr. Hair believed that the injury to S.W.'s liver, as well as the bleeding, and the bruising on his back, chest, abdominal area, and groin area were consistent with having occurred around the same time. (*Id.*, p. 556.) Dr. Hair opined that the cause of death was blunt impact to S.W.'s torso with liver lacerations and blood in the peritoneal cavity, and that the manner of death was homicide. (*Id.*, p. 550.)

Hamilton made statements about what happened to S.W. The next morning, August 10, 2014, Hamilton called his friend Antonio Snead. He told Snead that the baby

died, and that he thought he had "messed up." (*Id.*, p. 501.) Later, as they drove in Snead's car, Hamilton told Snead that he spanked S.W. with a belt because he urinated, and that he picked up S.W. and dropped him. (*Id.*, pp. 503-04.) During the car ride, Hamilton cut up a black belt and threw the pieces out of the car window. (*Id.*, pp. 502, 505-06.)

After he was arrested, Hamilton talked to police. He initially denying harming S.W., but then stated that S.W. urinated and was crying while he changed S.W.'s diaper. (*Id.*, pp. 684-85, 687, 692-93.) Hamilton said that he was frustrated by the crying, "lost control a little bit," and hit S.W. with his leather belt approximately ten times, from his thighs to his back. (*Id.*, pp. 684-90.)[3] Hamilton agreed that his fist could also have hit S.W. (*Id.*, pp. 694-95.)[4]

Pathologist Edward Willey testified for the defense. He reviewed the medical examiner's file, the histologic slides, and various records from the case. (*Id.*, pp. 798-801.) He agreed with Dr. Hair that S.W.'s death was caused by liver lacerations that led to excessive bleeding. (*Id.*, p. 805.) Dr. Willey did not believe a belt could have caused the

---

[3] Hamilton stated during the police interview that he hit S.W. "about six, ten times," but later in the interview, when Detective Bullard stated, "you spanked him at least ten times on the bed," Hamilton responded, "Yeah." (Doc. 6-2, Ex. 3, pp. 686, 692.) As the transcript denotes parts of the interview as "indiscernible," it appears that Hamilton might have amended his initial statement to say that he hit S.W. at least ten times.

[4] Hamilton told police that, in addition, S.W. fell and hit his head "pretty hard." (Doc. 6-2, Ex. 3, p. 704.) Hamilton also stated that while he was using the bathroom, he heard S.W. crying, and that S.W.'s older brother told him that S.W. had hit the headboard. (*Id.*, pp. 709-10.)

lacerations, noting a lack of breakage on S.W.'s skin. (*Id.*, pp. 805-06.) He "would expect that it would damage the skin or the tissue under the skin," as well as the "right side of the chest plate." (*Id.*, p. 805.)

But Dr. Willey agreed that S.W.'s liver was injured the day he went to the hospital, and may have occurred approximately six to eight hours earlier. (*Id.*, p. 826.) He further acknowledged the possibility that clothing could prevent a belt from breaking the skin. (*Id.*, p. 830.)[5] He also stated that S.W.'s apparent lack of movement on the Burger King video indicated he may have been injured by that time. (*Id.*, p. 827.) And while Dr. Willey thought it was possible that S.W.'s brother caused the injury, he also stated that this would be "uncommon," and that a scenario in which S.W.'s brother injured him would be "completely speculative." (*Id.*, p. 811.) Dr. Willey also agreed that when S.W.'s brother was interviewed, he never stated or suggested that he had jumped on S.W. (*Id.*, pp. 830-31.)[6]

Radiologist Elaine Engelman testified for the defense that S.W. also had a healing rib fracture that may have been several months old. (*Id.*, p. 777-79.) But Dr. Engelman testified that S.W.'s acute rib fracture could have happened the same day he came to the

---

[5] Hamilton stated that when he hit S.W., S.W. was wearing a onesie that was pulled up because his diaper was being changed. (Doc. 6-2, Ex. 3, p. 687-88.)

[6] S.W.'s brother did not testify at Hamilton's trial, and the exact content of his interview was not introduced into evidence at trial. Dr. Hamilton testified that he reviewed S.W.'s brother's forensic interview "to see if he provided any information, and he didn't provide very much, other than to say that he thought that his brother had choked to death." (Doc. 6-2, Ex. 3, p. 830.)

hospital, and that administration of CPR rarely causes rib fractures to a child because children's bones are pliable. (*Id.*, pp. 776-77, 781-84.) Radiologist George Shaughness testified for the defense that it was not apparent whether the trauma that caused S.W.'s scalp hematoma was accidental or intentional. (*Id.*, p. 791.) Dr. Shaughness also testified that if CPR was not performed properly, it could have led to S.W.'s acute rib fracture. (*Id.*, pp. 791-93.) Dr. Shaughness also testified, similar to Dr. Engelman, that if CPR was performed properly on S.W., it is unlikely to have caused the rib fracture. (*Id.*, p. 794.)

Considered in the light most favorable to the State—or even considered in any reasonable light—the evidence was more than sufficient to sustain Hamilton's convictions under the *Jackson* standard. In Florida, "[t]he unlawful killing of a human being," when "committed by a person engaged in the perpetration of . . . any [aggravated child abuse], is murder in the first degree. . . ." § 782.04(1)(a)2.h., Fla. Stat. Aggravated child abuse occurs when a person (1) commits aggravated battery on a child; (2); willfully tortures, maliciously punishes, or willfully and unlawfully cages a child; or (3) knowingly or willfully abuses a child and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to the child. § 827.03(1)(a), Fla. Stat.

A person commits aggravated battery when, in committing battery, the person intentionally or knowingly causes great bodily harm, permanent disability, or permanent disfigurement, or uses a deadly weapon. § 784.045(1)(a), Fla. Stat. And a battery occurs

16

when a person actually and intentionally touches or strikes another person against the will of the other, or intentionally causes bodily harm to another person. § 784.03(1)(a), Fla. Stat.

Here, the evidence overwhelmingly supports a finding that Hamilton committed an aggravated battery on S.W. Hamilton admitted that he struck S.W. The evidence, taken in the light most favorable to the State, establishes that Hamilton knowingly caused great bodily harm to S.W. because he struck S.W.—a one-year-old child—approximately ten times with a leather belt, and potentially with his fist, with enough force to lacerate his liver. And when Hamilton admitted to police that he struck S.W. after losing control, he stated that he understood S.W.'s crying out "because it hurts." (Doc. 6-2, Ex. 3, p. 698.) Since the aggravated battery was on a child, it constituted aggravated child abuse. § 827.03(1)(a), Fla. Stat.

Thus, the evidence was sufficient to support aggravated child abuse both as the offense charged in count two of the indictment, as well as the underlying felony for first-degree felony murder charged in count one of the indictment. The evidence, viewed in the light most favorable to the prosecution, was also sufficient to support the other elements of first-degree felony murder. A reasonable trier of fact could find that Hamilton killed the victim in the perpetration of aggravated child abuse.

The State's evidence showed that earlier in the day, S.W. was not injured and appeared normal. But by the time Hamilton took him to Burger King that evening, S.W. was less active than usual. During the day, Hamilton had repeatedly hit S.W. with a belt and might have hit S.W. with his fist. At the hospital, officers saw marks on S.W. consistent with his having been hit with a belt. Dr. Hair's observations led her to conclude that S.W.'s fatal injuries could have resulted from being hit with a belt or a fist that day.

Furthermore, Dr. Willey agreed that the cause of death was excessive bleeding due to liver lacerations. Although Dr. Willey did not believe that being hit with a belt caused the lacerations, the *Jackson* standard requires taking the evidence in the light most favorable to the State. Doing so supports the conclusion that the bleeding from the liver that caused S.W.'s death was due to lacerations sustained when Hamilton repeatedly and forcefully hit S.W. with a belt, and possibly with his fist.

Thus, a reasonable trier of fact could find that Hamilton engaged in the perpetration of aggravated child abuse and killed S.W. *See Lukehart v. State*, 776 So.2d 906, 921-22 (Fla. 2000) (finding that the evidence supported convictions for felony murder and aggravated child abuse when the medical examiner's testimony that the victim, a baby, died of injuries caused by blunt trauma from five blows to the head, and the injuries could have resulted only from the use of substantial force).

Hamilton has not shown that he was prejudiced by his appellate counsel's failure to raise a federal due process claim when challenging the sufficiency of the evidence because he has not demonstrated the claim's reasonable probability of success on appeal. *See Tuomi*, 980 F.3d at 795. The failure to show ineffective assistance of appellate counsel means that Hamilton also has failed to establish cause for the procedural default of his claim. Since Hamilton does not overcome the default, the federal due process claim raised in Ground One is barred from federal habeas review.

## V. CERTIFICATE OF APPEALABILITY

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id*. "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Hamilton must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Hamilton has not made the requisite showing. Finally, because Hamilton is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Hamilton's Petition for Writ of Habeas Corpus, (Doc. 1), is **DENIED**. The **CLERK** is directed to enter judgment against Hamilton and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on January 18, 2024.

*Kathryn Kimball Mizelle*
Kathryn Kimball Mizelle
United States District Judge